ANDREW HAAS

*v.*

ALFRED MYERS *et al.*

*Filed at Ottawa November 17, 1884.*

1. CONTRACT—*by letter or telegraph—when completed.* A contract by letter is completed the instant the letter accepting the offer is mailed, and is valid and binding whether the letter of acceptance is received or not.

2. But where anything else is left to be settled in respect to an offer by mail or telegraph, the acceptance of the offer by telegraphing will not complete the contract where the dispatch does not reach its destination.

3. A and B contemplated making a large purchase of cattle in the West, and it was agreed that A should go to see the cattle, and telegraph back to B the price per head if a purchase was made, when B was to reply by telegraph, without delay, saying "yes," if he was willing to take a third interest in the purchase, and then A was to telegraph back to B the estimated amount required to pay a third interest, which B was to place to the credit of A and his brother, in a Chicago bank, so that the latter might draw on the same, and cause the bank to telegraph that fact to A. A bought the cattle for $55,000, and telegraphed B the price per head, and he answered "yes," which dispatch never reached A. Later, B sent another dispatch to A, saying if the cattle were good there was no danger in buying them, which was received on the same day that A and another had concluded the purchase by paying the necessary advance. On the next day B arrived, and offered to pay his share of the price, which was declined: *Held,* that under the circumstances the sending of the first dispatch accepting a share in the purchase, which never reached its destination, did not complete the contract and make A and B partners in the purchase, there being something else to be done besides a mere acceptance, to carry out the contract, and also that B's offer to pay on the day after the purchase, and payment of the price, was too late.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. GEORGE GARDNER, Judge, presiding.

This was a bill in equity, filed by Andrew Haas, to have himself declared a partner with Alfred Myers in respect to a certain lot of cattle, and for an accounting.

The material facts appearing are, that during 1882, Haas' business was buying cattle, and shipping them to sell in the

Chicago market; that during the same time, Alfred and Benjamin Myers, and William H. and James E. Martin, were engaged in the same business,—Alfred and Benjamin Myers as partners under the firm name of A. Myers & Bro., and the Martins as partners under the name of Martin & Bro., and during that time the Myers and Martins were jointly engaged in the same business. Prior to September 20, 1882, Haas and Alfred Myers had, respectively, been negotiating for the purchase of a lot of cattle in Montana, known as the "Murphy herd," and on that day, Alfred Myers being about to visit the range where the cattle were kept, the two agreed that Myers would ascertain at what price the cattle could be purchased, and buy them if he saw fit; that in case he bought, he should telegraph Haas at Chicago, indicating the price per head; that thereupon Haas was to reply by telegraph, at once and without delay, saying "Yes," or "No;" that if he replied "yes," Myers, on receipt of the telegram, was to telegraph back to Haas the estimated amount required to pay for one-third interest in the cattle, which amount Haas was at once to place to the credit of A. Myers & Bro., at the First National Bank of Chicago, in order that Myers & Bro. could immediately draw for the same to pay toward the cattle, and Haas was to cause the bank to telegraph such credit to A. Myers & Bro. at Billings, Montana, which being done, Haas was to have one-third interest in the cattle. Myers proceeded to the range, and on September 26 made a trade with Joseph Murphy for the cattle, at $45 per head all around, the cattle to be taken at the ranch, Myers paying $5000 cash down as earnest money to bind the bargain, and agreeing to pay $15,000 more before the cattle were moved, and the balance of the purchase price at the time of the final shipment of the cattle at Billings, Montana, the purchase price being about $55,000, and agreeing also that the cattle should be moved within thirty days. The trade was to be concluded at Bi'ings. Murphy and Myers proceeded to Billings, arriv-

ing there on the 28th of September, and on the same day Myers telegraphed to Haas at Chicago, as follows:

"Do you want Murphy's forty-five, at ranch? Answer.
A. MYERS."

At once on receiving this, and on September 29, Haas telegraped back:

"Yes, I will take third interest. Will leave for Billings to-night."

This dispatch never reached Myers or Billings. Later, and within an hour, Haas sent a further dispatch:

"If Murphy cattle are good, there is no danger in buying them. Davis-Hauser cattle sold close to five cents through.
A. HAAS."

This dispatch was received by Myers on October 2. No other dispatch or information than this last one being received from Haas by Myers, though Myers inquired frequently at the telegraph office for any reply from Haas, and in the meantime William H. Martin, one of the partners, having joined Myers and Murphy at Billings, on the 2d day of October the contract with Murphy was concluded, and Myers and Martin themselves raised and paid the whole $15,000, Murphy having refused to wait any longer, and declared that if it were not paid on that day he would refund the $5000 already paid, and "call the trade off." The next day (October 3) Haas appeared at Billings and claimed a third interest in the contract, insisting that he had sent to Myers the first above mentioned dispatch. Myers informed Haas that he had never received any such telegram, but had received the one last named, about there being "no danger in buying" the cattle, etc., and that only, and that he and Martin had raised and paid the necessary funds the day before, and that he (Haas) was entitled to no interest in the purchase. Haas and Myers went together to the telegraph offices at Billings, to

ascertain whether or not such dispatch (the one first named) had been received there. It was ascertained that no such dispatch had been received there, and Myers reiterated his refusal to permit Haas to have any interest in the cattle, notwithstanding Haas stated that he was ready to pay his share, and to do what might be required of him. Myers and his associates shipped the cattle to Chicago, and made a net profit thereon of $19,100. That amount remained in the hands of Adams & Burke, commission merchants at Chicago.

This bill was filed October 31, 1882, praying that Haas might be declared to be a partner to the extent of one-third interest in the purchase of the cattle; that an accounting might be had between the partners, and a decree granted the complainant for the one-third share of the net profits, and an injunction restraining the payment over of the money by Adams & Burke. A temporary injunction was granted, and afterwards, on the final hearing, the injunction was dissolved and the bill dismissed. On appeal to the Appellate Court for the First District the decree was affirmed, and a further appeal taken to this court.

Messrs. DUPEE, JUDAH & WILLARD, for the appellant:

If a party makes a proposition by letter, it is a continuing one; and when the other party accepts and mails his letter of acceptance, from that instant the contract is complete and binding, even if the letter never reaches its destination,— and the courts apply the same rule to like correspondence by telegraph. 1 Chitty on Contracts, (11th Am. ed.) 18, note m; *Taylor* v. *Merchants' Fire Ins. Co.* 9 How. 390; *Moctier* v. *Frith,* 6 Wend. 103; *Household Fire Ins. Co.* v. *Grant,* L. R. 4 Exch. Div. 216; *Hallock* v. *Insurance Co.* 26 N. J. 280; *Trevor* v. *Wood,* 36 N. Y. 307; *Minnesota Oil Co.* v. *Collier Lead Co.* 4 Dill. 431; *Vassar* v. *Camp,* 14 Barb. 341; *Abbott* v. *Shepard,* 48 N. H. 14; 2 Parsons on Contracts, *582; Pomeroy on Contracts, 95.

Messrs. JUDD & WHITEHOUSE, and Mr. WILLIAM RITCHIE, for the appellees:

The mere mailing of a letter accepting a proposition does not complete a contract when the letter is never received. The proposer not receiving any reply, may consider that his proposition has not been accepted. 2 Langdell's Cases on Contracts, 993, 994; *McCullough* v. *Eagle Ins. Co.* 1 Pick. 278; *Lewis* v. *Browning*, 130 Mass. 175; *Harris' case*, L. R. 7 Ch. App. 597; *Finucan's case*, 20 L. T. R. (N. S.) 729; *Hibb's case*, L. R. 4 Eq. 12; *Reidpath's case*, L. R. 11 Eq. 86; *Townsend's case*, L. R. 13 Eq. 153; *Pellat's case,* L. R. 2 Ch. 527; *Gunn's case*, L. R. 3 Ch. 40; *Sahlgren's case*, id. 323; *British Telegraph Co.* v. *Colson*, L. R. 6 Exch. 115.

But were the rule as contended by appellant, it is not applicable here,—first, because Haas did not use all proper means to assure the delivery of his reply telegram, (Pollock on Contracts, 20; Langdell on Contracts, sec. 15;) second, it is inapplicable because this is the case of a telegram—not a letter. The company is liable to the sender, and not the receiver, for a failure to transmit or deliver the message. *Playford* v. *Telegraph Co.* L. R. 4 Q. B. 706; *Dickson* v. *Telegraph Co.* L. R. 2 C. P. 62; Rev. Stat. 1874, chap. 134, sec. 6.

The terms of the contract plainly imply that Haas' reply should actually reach Myers, and within a very short time, to make it binding. It was competent for Myers to make the completion of the contract depend upon such actual receipt of Haas' reply, and within a reasonable time. Pollock on Contracts, 17; Leake on Contracts, 39, note.

Such condition may be as well inferred from the acts of the parties. *Maclay* v. *Harvey*, 90 Ill. 529; *Lewis* v. *Browning*, 130 Mass. 175.

Again, if the reply had reached Myers it would not conclude the contract, as considerable remained to be done by both sides after that. 1 Wharton on Contracts, sec. 17.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

It is insisted upon on the part of the appellant, that the partnership here claimed was actually formed; that if there was not a literal there was a substantial performance by Haas of the conditions of the contract; that he did all that he could,—telegraphed, as he had agreed, his acceptance,— and could do no more until action by Myers; that not putting up his share of the money in the manner provided, was because of the failure of Myers to advise him by telegram of the amount necessary; that the telegraphic acceptance sent by Haas, although not received, had all the legal effect it could have had if it had been received by Myers.    In support of this last proposition the rule governing the negotiation of contracts by correspondence through the mail is appealed to, and it is contended the same rule applies in the negotiation of a contract by telegraph,—that rule being, that where parties undertake to contract by letter, and one party makes a proposal by letter, and the other by letter accepts and posts his acceptance, the minds of the parties have met, and from the instant of mailing the acceptance the contract is a valid and binding ᵒne.    See *Household Fire Ins. Co.* v. *Grant*, L. R. 4 Exch. Di:... ᵻ.ᵤ;  *Taylor* v. *Merchants' Fire Ins. Co.* 9 How. 390;  *Mactier* v. *Frith*, 6 Wend. 103;  *Hallock* v. *Insurance Co.* 2 Dutch. 268;  *Minnesota Oil Co.* v. *Collier Lead Co.* 4 Dill. 431;  *Abbott* v. *Shepard*, 48 N. H. 14;  *Trevor* v. *Wood*, 36 N. Y. 307;  Pomeroy on Contracts, 95, and cases there cited. Although there be contrary authority that a contract made by mutual letters is not complete until the letter accepting the offer has been received by the person making the offer, (see *Lewis* v. *Browning*, 130 Mass. 175,) we regard the weight of authority to be in favor of the rule as first above stated. A distinction has been taken, that though in general such a contract takes effect from the time of acceptance, and not from the subsequent notification of it, yet the offerer may not

be bound by the fact that the letter of acceptance had been put in the post-office, if the letter never reached its destination. The preponderance of authority does not appear to sustain this distinction, but to hold that the mailing of the letter of acceptance completes the contract, whether the letter reaches its destination or not. In the above cases, in 4 Dill. and 36 N. Y., it was held that the same rule applied in the case of correspondence by telegraph as in the case of correspondence through the mail. Whether the rule does so fully apply in the former case we do not find it necessary now to determine, as, conceding that it does, we do not consider that the rule has application to the facts of the present case. We think that under the arrangement entered into between the parties, the formation of the contract was made dependent upon the actual communication by telegraph, to Myers, of Haas' acceptance. This is not the case of an offer made, and where the simple acceptance completes the contract between the parties. Haas' reply, if it had reached Myers, was not the conclusion of the bargain. Considerable remained to be done afterward, on both sides. Myers, after receipt of the dispatch, was to telegraph again, giving the amount to be deposited. Haas was to depo' ʲ' .is amount. The bank was then to telegraph the credit to Myers, so as to make it available for the purchase of the cattle.

We think, too, the terms of the contract imply that Haas' answer that he would take a third interest, should actually reach Myers, and within a very short time, or the contract would not be binding. A large purchase was involved, requiring the payment of a considerable amount of money. Promptness was necessary, and it was important that Haas should furnish his share of the purchase money necessary to complete the purchase. It was uncertain whether the cattle would be purchased by Myers. and if so, whether Haas would want a third interest in them at the price they could be purchased for. It was therefore arranged that if Myers pur-

chased, he should telegraph Haas the price per head, and if Haas wanted a third interest at the price, he should, immediately after receiving Myers' dispatch, answer back, by telegraph, "Yes" or "No." If the answer was "yes," then Myers would immediately inform Haas, by telegraph, of the amount of money that would be required to be place⌐ ⌐ the credit of A. Myers & Bro. at the First National Bank in Chicago, in order to secure a third interest in the purchase of the cattle. Now, Haas never did advise Myers, by telegraph, that he would take an interest. No such telegram ever came to Billings,—the place of destination. Manifestly, delivering the message containing an affirmative reply to the telegraph office for transmission, did not answer the purpose. Myers could not act upon that mere delivery. He must have knowledge. Haas was to telegraph, and if the answer was "yes," Myers was to telegraph back the amount of money required; but he could not telegraph back what was the amount of money needed until he was informed of Haas' desire to take a third interest,—until he had received the telegram "yes." This shows that it was in the contemplation of the parties that this telegram should not merely have been deposited for transmission, but that it should have been transmitted and been received before there could arise between the parties any completed contract. It was essential that notification of Haas' desire to have a part in the purchase should have come to Myers, to enable him to inform Haas of the amount of money needed from him, and so enable Haas to perform on his part by furnishing his share of the purchase money.

But further, within an hour after depositing in the telegraph office, for transmission, his telegram of acceptance,— "yes,"—Haas sends this misleading dispatch: "If Murphy cattle are good, there is no danger in buying them,"—and this telegram was received by Myers October 2, and was the only one received by him, or that ever came to Billings in answer to his inquiry if Haas wanted an interest in the pur-

chase. What was Myers to understand from this? If Haas wanted an interest in the cattle, the telegram agreed upon between him and Myers by which he should signify that wish, was the word "yes." This was not such a telegram, and it did not express any idea that Haas wanted or would take an interes n the cattle. It stated merely that upon a certain hypothesis,—if the Murphy cattle are good,—there is no danger in buying them. We think that Myers was justified in taking this dispatch sent by Haas, as an abandonment of all interest in the contract, or at least as denoting a want of consent on Haas' part to take an interest in the cattle, and a want of intention of completing the proposed contract in furnishing a part of the purchase money, and that Myers could not place further reliance thereon, but might well proceed in the completion of the purchase from Murphy, by raising himself, and with the assistance of Martin, the whole amount of the $15,000 required to be paid on that day to Murphy, and claim the purchase as being his own, to the exclusion of Haas from any share in it. This second telegraphic dispatch did not come within any arrangement made between Haas and Myers, but was Haas' own independent, voluntary act, and he alone is to blame for its misleading effect. The $15,000 which was to have been paid on moving the cattle from the ranch, Murphy was insisting must be paid on October 2, or that he would refund the $5000 paid, and declare the trade "off,"—that he would not wait any longer. Myers and Martin, after receipt of that dispatch, raised the money on that day, and paid it. To be sure, Haas appeared in person at Billings the next day, and offered to perform. This, we think, was too late. It would not be a substantial performance. It was essential that he should have performed before; that he should have contributed his share to the payment of the purchase money that was paid to Murphy; that he could not, after leading Myers to think that he did not want an interest in the purchase, and the latter and Martin

raising and paying all the purchase money required, come in afterward, though only the next day, and then offer to pay his share of the money, and demand the right of participation in the purchase. To have then admitted Haas into the purchase would have been but a matter of favor with Myers—not of obligation.

We think the decree dissolving the injunction and dismissing the bill was right, and the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*