AXEL CHYTRAUS *et al.*

*v.*

EDWARD G. SMITH.

*Filed at Ottawa March 24, 1892.*

1. AGENT—*authority to sell certificate of purchase under a foreclosure.* After the expiration of twelve months from a foreclosure sale, but within fifteen months, a person sought to purchase the certificate of purchase held by an insurance company organized under the laws of New York, and applied for that purpose to an agent of the company, who sent a written request to the company to send the certificate, assigned in blank, to its attorneys in the foreclosure suit, with instructions to deliver the same to the party designated by such agent, on payment of the amount due. The company complied with such request, and sent the certificate as requested, and the agent then accepted the offer to pay the sum due on the certificate, and so notified the person making the offer, by letter : *Held,* that the compliance on the part of the company with such request invested the agent with full power to sell and transfer the certificate to whom he pleased.

2. The right to designate the party to whom the certificate was to be delivered, subject only to the restriction that the delivery should be upon payment of the amount due thereon, necessarily implied the right to make the negotiations, and when the designation was once made it vested a right in the person designated, and the company could not thereafter withdraw the power under which the agent had acted, or do any other act to impair that vested right.

3. SALE OF CERTIFICATE OF PURCHASE — *delivery — when treated as made.* In such case, if the delivery of the certificate of purchase ought to be made by the attorneys to whom it was sent for delivery, the company can not be heard, in a court of equity, to say that it was not done, for the reason that equity will treat that as done which ought to have been done.

4. SAME—*by attorney employed to foreclose.* An attorney or solicitor employed to foreclose a mortgage has no general authority, as such, to negotiate a sale of his client's certificate of purchase.

5. SAME—*concludes vendor's authority.* After a valid sale of a certificate of purchase is made through an agent, the vendor will have no right or power to invest any other person with authority to make any contract inconsistent with the prior contract of sale made by the agent, and a second sale will be invalid.

6. SAME—*when consummated by letter.* Where an agent of an insurance company, duly empowered to make a contract for the sale of a certificate of purchase held by the company, in reply to a letter of the former owner of the equity of redemption offering to pay the sum due on the certificate, mails a letter to the latter, saying, "Get ready to receive the certificate and you shall have it," the contract of sale will be consummated, and the fact that such reply accepting is not received for two or three days later will be immaterial, and the party so purchasing would be liable in an action at law for a failure to perform the contract.

7. SAME—*assignment on separate paper.* An assignment of a certificate of purchase of land, not upon the certificate itself, but by a blank assignment on a separate contract, will not invest the legal title to the certificate in the assignee. The statute requires the transfer to be by indorsement, to vest in the assignee the rights of the assignor. Without such indorsement the holder takes no greater rights than the assignor, and subject to all equitable defenses against him.

8. The holder of a certificate of purchase, by contract sold the same to the former owner of the land, who was in actual possession. Two days later the holder authorized his attorney to sell the certificate, which he did by a transfer, but not by indorsement: *Held,* that the equity of the first purchaser, being the oldest, must prevail, and that the purchaser of a mere equitable estate is not embraced in the definition of a *bona fide* purchaser, and that the possession of the first purchaser was notice of his equities.

9. SAME—*immaterial how purchaser may raise the purchase money.* On bill for the specific performance of a contract for the sale of a certificate of purchase, it is immaterial how the purchaser may procure the purchase money. That he is compelled to make contracts with other parties selling or mortgaging to them the rights he is to derive under his contract, for the purpose of enabling him to perform by paying the price, is a matter that does not concern the vendor.

10. REDEMPTION—*contract for extending the time.* The holder of a certificate of purchase may contract with the holder of the equity of redemption or former owner of the land for its sale or for the extension of the time for redemption, and in the absence of fraud such contract will be enforced.

11. The extension of the period of redemption beyond that fixed by law may as well form the subject of a contract as any other property right. The interest of the purchaser in a certificate of purchase is property, and he may, in the absence of fraud, dispose of it as he pleases, and the former owner of the equity may therefore purchase a right of redemption previously lost, as well as any other right or title to the property.

12. SAME—*contract after expiration of the statutory period—sufficient consideration—freedom from fraud.* The fact that the amount agreed to be paid is precisely the same that would have been paid had a legal redemption been made by a judgment creditor, affects merely the amount of the consideration, and not the fact of redemption, for any agreement to give a right where none before existed, or to extend or enlarge a previously existing right in consideration of any sum to be paid therefor, is ample consideration to support a contract.

13. Where the time of redemption of land sold under a decree of foreclosure has not expired as to creditors of the former owner of the equity of redemption, and he has the right to redeem, through contract with judgment creditors, a sale to him of the certificate of purchase at the precise sum required to effect a redemption through such creditors, the value of the land is not important, when it appears that such redemption would have been made but for such sale of the certificate ; and such person will not be chargeable with fraud, from the fact that the agent selling the certificate failed to give the principal information that the value of the land was greater than the amount of the redemption money.

14. SAME—*right of debtor to induce judgment creditors to redeem.* After the time of redemption allowed the debtor has passed, he has the undoubted right to do all he can to induce his creditors to redeem, and thereby reduce his indebtedness, and whatever rights he may acquire by contract from his creditors, after or in view of a valid redemption, can not concern any one except the parties contracting.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. OLIVER H. HORTON, Judge, presiding.

Edward G. Smith filed his bill of complaint in the circuit court of Cook county, against Axel Chytraus, the Equitable Insurance Company of Connecticut, Edward G. Mason and Henry B. Mason, as partners, under the firm name of Mason Bros., and William P. Nelson and John L. Nelson, alleging therein that on the 13th of September, 1887, complainant owned block 1 of the Equitable Trust Company's subdivision of parts of sections 20 and 21, in township 40, north, range 14, east of the third principal meridian, in Cook county ; that the said premises are of the value of $100,000, and he believes them to be worth $125,000; that on the day last aforesaid, complainant and wife executed a mortgage to the

Equitable Trust Company, to secure his indebtedness to that company of $36,600; that, becoming embarrassed, he was unable to pay said indebtedness according to its terms, and on October 30, 1888, said Trust company filed its bill for foreclosure in the United States Circuit Court for the Northern District of Illinois, making complainant, his wife and other parties, defendants, and on May 28, 1889, a decree of foreclosure was therein entered, finding the amount due from complainant to the Equitable Trust Company to be $43,533.90 and costs, which decree included for attorney's fees $1850; that on June 24, 1889, Henry W. Bishop, master in chancery of said court, in pursuance of said decree, sold said premises, and the Equitable Trust Company purchased the same and received a master's certificate of purchase; that he did not make redemption within twelve months after sale, but before the expiration of fifteen months from the time of sale, and prior to September 23, 1890, he entered into an agreement with the Equitable Trust Company, who was then the holder of said certificate of purchase, to purchase said certificate from it for the amount of the sale, namely, $43,533.90, with interest at the rate of eight per cent per annum from June 24, 1889, to September 24, 1890, which amount he was to pay on or before September 24, 1890, in cash; that this agreement was manifested in writing, and signed by the said company; that after the making of said agreement said company sent said certificate, assigned in blank, to Mason Bros., its agents and attorneys, directing and requiring them to deliver it to complainant upon payment of the amount aforesaid; that he made preparation to take said certificate and pay said company, through said Mason Bros., the amount aforesaid, but that Mason Bros., pretending to act as agents of said company, on or prior to September 23, 1890, claimed to have sold and delivered said certificate to Axel Chytraus; that said certificate was not paid for by said Chytraus until after September 24, 1890, and after said Chytraus had received notice of the

agreement with complainant; that said Chytraus had agreed
to, and did after September 24, 1890, pay said Mason Bros.,
in addition to the amount complainant had agreed to pay the
company, the sum of about $1200; that Chytraus had notice
of the agreement between the complainant and said Equitable
Trust Company at the time of receiving the certificate and at
the time of paying therefor; that he believes the sale and
delivery to Chytraus was through procurement and collusion
of Henry B. Mason, or one of said firm of Mason Bros., and
that Chytraus and Mason Bros. colluded, for the purpose of
cheating and defrauding complainant, and for the purpose of
depriving him of the great gain he would have received if the
said agreement had been carried out; that the amount of
his damages is at least $50,000, and he alleges and claims
$75,000 by the non-performance of said contract; that he
was, on and prior to September 24, 1890, and is now, ready
and willing to perform said contract, and hereby offers to per-
form the same and pay the sum of money agreed upon by
him, with interest; that said certificate is not a negotiable
instrument, but that the taker thereof takes it subject to the
same equities as in the hands of said company; that after
said company had rendered itself incapable of transferring,
and refused to transfer, the certificate to him, he made ar-
rangements with certain of his judgment creditors, namely,
William P. Nelson and John L. Nelson, who had a judgment
for $280 and costs against him, upon which execution had
been issued and returned not satisfied, to redeem said prem-
ises, complainant agreeing to furnish the money, they to
obtain the title and convey to him upon receiving the amount
of their judgment and interest; that Mason Bros., agents of
said company, had given him a memorandum of the amount
requisite to redeem, and he procuring such amount, viz.,
$47,887.29, went with said judgment creditors to the clerk of
the United States Circuit Court and offered to redeem by pay-
ing the amount aforesaid, which was the correct amount, as

required by the statutes of Illinois, when the clerk of said United States Circuit Court informed him that he could re-- deem only by complying with the rule of said court which requires interest at the rate of ten per cent per annum upon the amount of purchase money, and one per cent commission to the clerk of court; that such rule is illegal and void, at least so far as the amount is concerned; that prior to calling upon the clerk of said court to redeem, said judgment cred-- itors, on September 24, 1890, caused execution to be issued against complainant on said judgment, and placed it in the hands of the sheriff to make levy upon the premises in ques-- tion, and requested him then and there to indorse such levy, and thereupon said sheriff, on September 24, 1890, made a levy on said premises by virtue of said execution; that after said execution was placed in the hands of the said sheriff, and after said levy, said Axel Chytraus paid the sheriff the amount of said judgment, and that they have never accepted from the sheriff the amount so paid.

The bill prays that a decree may be entered compelling Chytraus, and all persons claiming under him, to assign and convey to complainant said certificate and all interest in said premises acquired thereunder, but if, in the opinion of the court, complainant is not entitled to have said premises con- veyed to him, then that he may have judgment against said Trust company, Edward G. Mason and Henry B. Mason, or either of them, for the amount of his damages so suffered; also, a prayer for an injunction restraining Chytraus from transferring the certificate, selling or disposing of said prem- ises, or any part thereof, and from procuring a master's deed, and for general relief. There was a demurrer to the bill, which was overruled by the court.

The defendant Chytraus answered that he admits that on September 13, 1887, complainant owned the real estate de- scribed in the bill, and executed and delivered a mortgage thereon, as stated; that the Equitable Trust Company filed

a bill for foreclosure, and a decree was obtained, as stated, a sale of the premises by Henry W. Bishop, master in chancery, on June 24, 1889, and issuance and recording of certificate of purchase, as stated; that complainant did not redeem within twelve months; denies that complainant, prior to September 23, 1890, or at any time, entered into an agreement with the Equitable Trust Company, and sets up the Statute of Frauds; denies that the Trust company sent a certificate to Edward G. and Henry B. Mason, or either of them, directing and requiring them, or either of them, to deliver said certificate to the complainant; admits the sale by the Trust company of the certificate to this defendant, but denies notice of any agreement by it with the complainant, and denies all charges of collusion with the Masons; avers payment for said certificate in money, really and *bona fide*, to said Trust company; denies complainant's readiness and willingness to pay on or before September 24, 1890, the sum of money alleged by him to be requisite to purchase said certificate, and sets up that defendant is an innocent purchaser without notice; denies that the complainant, or any of his judgment creditors, offered the clerk of the United States court, or any person, the sum of $43,887.29, or any sum, to redeem from said sale; admits the issuing of execution against the complainant, but denies that any levy was made; admits that he (defendant) paid the judgment for which said execution had issued, and avers that he did so to protect the premises purchased by him from the lien of said judgment.

Edward G. and Henry B. Mason answered that they admit that on September 13, 1887, complainant owned the premises as alleged, and aver that simultaneously with his purchase of said premises from the Equitable Trust Company he gave back to said company a purchase money mortgage for all, or nearly all, the purchase money of said block 1, and never made any payment of principal, interest or taxes under said incumbrance; admit the execution of the purchase money

mortgage, foreclosure, sale, and issuing of the certificate, as alleged, and set up the Statute of Frauds; admit that the master's certificate was sent to these defendants, but deny that it was sent with directions to sell to complainant; aver that they received instructions from the Trust company to sell the certificate to the first person who would pay principal and interest therefor in cash; that Axel Chytraus purchased and paid for the same in full on September 22, 1890, and the certificate was then delivered to him; deny, on information and belief, that Smith had any agreement with the Trust company, and deny positively that these defendants knew of any such agreement.

The Equitable Trust Company answered that it admits that on September 13, 1887, complainant owned the property described in the bill; that complainant became the owner, by purchase, from this defendant, and that the mortgage mentioned in the bill was given for the purchase money; that complainant at no time paid any principal or interest thereby secured, nor any taxes, this defendant being obliged to pay the same; admits the foreclosure, and that a decree for $43,-533.90 and costs, and $1850 solicitors' fees, was entered on May 28, 1889; admits the sale, purchase by this defendant, and recording of said certificate on June 24, 1889; admits complainant did not redeem within twelve months, but denies that before the expiration of fifteen months after said sale, or at any time, complainant entered into any agreement with this defendant to purchase said certificate, and sets up the Statute of Frauds; admits sending the certificate to Mason Bros., but denies that it sent it with any direction or request to deliver it to complainant; denies that complainant tendered the amount due under the foreclosure decree, to the clerk of the United States court.

Leave was given to amend the bill by making Carson, Haugan and Lindgren defendants. Those parties then answered that they admit that complainant owned the premises de-

scribed in the bill, on September 13, 1887; that he and his wife executed the mortgage; that the same was foreclosed and the premises sold, and that complainant did not redeem within twelve months, as alleged; deny that there was any agreement between complainant and the Equitable Trust Company regarding the sale to him of the certificate, and set up the Statute of Frauds; admit that the certificate was sent to Mason Bros., but deny that it was so sent with directions to deliver it to complainant; deny that complainant was ever prepared to pay the said Trust company, or any one else, the amount of the said mortgage debt, with interest; admit that Mason Bros. delivered the certificate to Chytraus, but deny the allegation that it was not paid for until after September 24, 1890; aver that Chytraus bought it in good faith, for a valuable consideration, and paid for it on September 22, 1890, without any notice on the part of Chytraus, or any of these defendants, of any pretended claim by complainant; deny that any tender was made to the clerk of the United States court, of the amount due under the foreclosure decree, for the purpose of redeeming; deny that any levy under the execution was made, as alleged in the bill. Carson admits that he is half owner with said Chytraus of said certificate. Haugan and Lindgren aver that they have an interest in said certificate, in the nature of a lien, as security for a loan of $20,000 made to said Chytraus and Carson.

There was a general replication filed to each of the answers of the several defendants. The Equitable Trust Company then asked and obtained leave to file its cross-bill, wherein it alleged, that in the year 1889 defendants Edward G. and Henry B. Mason, co-partners as Mason Bros., solicitors, were by cross-complainants employed as its solicitors in and about the foreclosure of the mortgage mentioned in the original bill herein, and that as such they conducted the foreclosure referred to in said original bill, and caused said property to be sold; that at such sale this cross-complainant became the

purchaser, and a master's certificate issued in its name, and Mason Bros. received the same, as its solicitors; that the purchase price at said sale was $43,533.90; that in the summer of 1890 said land was, and it is now, of the value of at least $85,000 or $90,000, although theretofore it had not been worth more than $49,000 or $50,000; that cross-complainant's home office is at New York, where its vice-president and secretary have always resided and do now reside, said officers being its only executive officers charged with the matter of disposing of said certificate, and having authority to sell or dispose of it, or to ratify, in the company's name, any contract for the sale thereof; that the value of said land in the summer of 1890, and as it now is, was not known to this cross-complainant or its said officers, but said officers supposed and believed until after this suit was begun, that said land was worth only a very little, if any, over and above the amount for which cross-complainant had purchased at said foreclosure sale, and it was then well known to said Mason Bros. that cross-complainant and its said officers held such a low estimate of said land, and were not, in fact, advised of the true value thereof, that under its agreement with Mason Bros., said Mason Bros., in case said certificate should not be redeemed or sold, but a deed issue to this cross-complainant, should receive from this cross-complainant, in full for their services, $500, but if the certificate should be redeemed or sold, so that cross-complainant would get the money instead of the land, then Mason Bros. might charge and collect from the debtor or purchasers of said certificate a much larger sum than $500 for their services; that Mason Bros. have long resided in Chicago, not far from where said land is situate, and at the time of the transactions hereinafter mentioned they knew, or in the exercise of ordinary care and good faith toward your orator, as its solicitors, might readily have known, the real value of this land, to-wit, $85,000 or $100,000; that during the past five years one George W. Kendall has been, and

is now, employed by this cross-complainant as its agent in many matters at Chicago, his business being in part to keep informed as to the value and condition of cross-complainant's property and interests at Chicago, in order to enable the said officers to act intelligently in relation thereto, all of which was then well known to said Mason Bros.; that on September 18, 1890, Mason Bros. informed this cross-complainant, by telegraph, that Kendall was absent from Chicago, and they were unable to learn his whereabouts, and that Kendall had instructed them to sell said certificate to the first person who would pay cash therefor, and cross-complainant's secretary at New York supposed and believed that such communication was true, and cross-complainant's said officers believing that said land was worth but little, if any, above the face value of said certificate and interest thereon, telegraphed Mason Bros. its permission to sell said certificate to the first person who would pay cash therefor; that, in fact, said Kendall had not so instructed said Mason Bros., but, on the contrary, had advised them that said certificate should, if practicable, be kept until the redemption period had expired, and had informed said Mason Bros. that said certificate would then be of much higher value than before,—which was a fact; that on or about August 29, 1890, Mason Bros., without cross-complainant's knowledge or consent, employed George H. Rozet, a real estate agent at Chicago, to procure a purchaser for said certificate, authorizing said Rozet, without endeavoring to secure a better price, to offer the same for its face value and interest, and a commission of two and one-half per cent, agreeing with said Rozet that such commission from the purchaser should be a condition of any sale, and that such commission should be divided between said Rozet and said Mason Bros.; that the defendant Carson is a real estate dealer at Chicago, and the defendant Chytraus an attorney practicing law at Chicago, and is now, and was at the time of the transaction herein mentioned, the attorney and general legal adviser of the said

16—141 ILL.

Carson; that on or about September 16, 1890, said Carson and Chytraus, both being then fully advised of the true value of the property in controversy, agreed together to purchase said certificate with their joint means and for their joint benefit, and Carson, acting as broker for Chytraus, and concealing from Rozet that he himself was otherwise interested in the purchase, introduced Chytraus to Rozet as an intending purchaser, upon the agreement that he, Carson, should receive a part of Rozet's commission, and thereupon Rozet, without endeavoring to secure better terms, though well aware of the true value of the said land, disclosed to Carson and Chytraus the terms of sale as intrusted to him by Mason Bros., and disclosed to them that Mason Bros. were the attorneys and solicitors of this cross-complainant, and had or could obtain from this cross-complainant the possession of the certificate; that said Rozet then introduced said Chytraus to Mason Bros. as a purchaser; that Chytraus then in his own behalf, and as agent for Carson for their joint benefit, pursuant to their previous agreement, agreed with Mason Bros. to buy said certificate for the face value, interest, and two and one-half per cent commission; that said Mason Bros., though then well knowing the true value of said land, made no effort to get better terms for this cross-complainant, and sent to this cross-complainant the telegram aforesaid; that until after this suit was brought, neither this cross-complainant nor any of its officers had any knowledge or information from Mason Bros., or otherwise, regarding the employment of said Rozet, or the agreement to exact from any purchaser such commission, or of the purpose of said Mason Bros., or any one else purporting to act in its behalf, to receive commissions or any other reward from any purchaser, or the agreement between said Carson and Rozet to divide commissions; that after securing said cross-complainant's consent to sell said certificate for its face value, and interest, only, Mason Bros., about September 20, 1890, received from it, by mail,

said certificate, which had, to the knowledge of Chytraus, been theretofore kept in the possession of its said officers at New York; that said certificate was not, when sent to said Mason Bros., and has never since been, indorsed by this cross-complainant, or any one else in its behalf; that until after this suit was begun neither it nor any of its officers knew that said Chytraus or Carson was in any way interested in said purchase or agreement to purchase; that about September 22, 1890, Mason Bros. delivered said certificate, unindorsed, to said Chytraus, receiving and accepting in full payment from him the face value and interest thereon, and said commission of two and one-half per cent, being $1196.69, the payment of said commission being part of the bargain, without which Mason Bros. refused to make the sale, and Mason Bros. then, by direction of Chytraus, paid over to Rozet a part of said commission and retained a part thereof, to-wit, $498.03, and Rozet then paid over to Carson a portion, to-wit, $200, which said Carson has ever since retained; that Carson received said $200 from Rozet with knowledge that Mason Bros. had agreed to share, and had shared, said commission with said Rozet; that it offers to repay to Chytraus and Carson the full sum by them or on their behalf paid out for said certificate, with proper interest and reasonable costs; that Edward G. Smith claims some interest in said certificate, but that cross-complainant is the sole legal and equitable owner thereof, and is entitled to recover possession thereof and receive the master's deed for said land.

The prayer of the cross-bill is, that the transfer of the certificate to said Chytraus may be declared null and void, and the same may be returned and reconveyed to cross-complainant, as lawful owner thereof, upon repayment by it of the purchase price, with interest and costs; that cross-complainant may be decreed to be the sole and lawful owner thereof, or that Mason Bros. may be ordered to pay cross-complainant the difference between the real value of said land and the

amount they received for said certificate, and also the sum received by them as commissions, as aforesaid, and prayer for general relief.

Answers were filed by the respective defendants putting in issue the material allegations of the cross-bill, so far as they were severally affected by them, and there were replications to these several answers.

On final hearing the court decreed that the cross-bill be dismissed, and that the relief be granted as prayed in the original bill. The court recites, in its decree, facts found from the evidence to be substantially as alleged in the original bill, and among other things it recites "that said complainant did not make redemption of said premises within twelve months after said sale, but before the expiration of said twelve months negotiations were entered into between said Smith and said Equitable Trust Company, and after the expiration of said twelve months, and before the expiration of fifteen months from the time of said sale, and prior to the 22d day of September, 1890, said complainant entered into an arrangement, understanding or agreement with said Equitable Trust Company, which was then the holder of said certificate of purchase, that said complainant should pay to said company the amount for which said premises were sold, viz., $43,533.90, with interest thereon at the rate of eight per cent per annum, from June 24, 1889, up to the time of such payment, which amount was to be paid by said complainant to said Equitable Trust Company on or before September 24, 1890, in cash, and that thereupon said Equitable Trust Company should deliver to said Smith said certificate of purchase, duly assigned; that said complainant, relying on said arrangement, understanding or agreement, paid out various sums of money in consequence thereof, and was put to considerable expense in preparation therefor, and was lulled into security thereby, and before making arrangements to redeem under the statutes and rules of the Circuit Court of the United

States, as he might have done through various judgment creditors of his who were willing and agreed to permit him to use their judgments for such purpose; that said Equitable Trust Company, after the arrangement, understanding, representations or agreement aforesaid, sent said certificate of purchase unto its attorneys, the said defendants Edward G. and Henry B. Mason, doing business under the firm name of Mason Bros, with what purported to be an assignment in blank, upon a separate sheet of paper, said Equitable Trust Company by letter directing and requiring them to deliver such certificate of purchase unto such person as one George W. Kendall, the general western manager of said company, might designate, upon payment of the amount then due thereon; that when said certificate, and paper purporting to be an assignment thereof, were offered in evidence they were pinned together at one corner, but when or by whom they were pinned together does not appear; that said George W. Kendall did, on and before September 20, 1890, and by his letter to said Smith of said last date, designate said complainant as the person to receive said certificate at any time on and prior to September 24, 1890, upon payment by him of the amount then due, and did, on the 20th day of September, 1890, as the agent of said Equitable Trust Company, agree with said complainant that he should have said certificate of purchase at any time on or prior to September 24, 1890, upon payment by said complainant of the amount then due upon said certificate, with interest thereon, according to its face, and said complainant did agree to buy and pay for said certificate of purchase upon the basis and terms aforesaid, and that said Kendall then and there had authority to bind said Equitable Trust Company by said designation."

Other material matters appearing in the decree are sufficiently referred to in the opinion.

Messrs. JUDD, RITCHIE & ESHER, for the plaintiff in error the Equitable Trust Company:

There was no promise, express or implied, to extend the time of redemption.

It was the duty of Mason Bros. to have informed the company of all facts as to value and commissions. They were selling in their own interest.

One who calls for specific performance must be able to show that his conduct has been clear, honorable and fair. *Mitchell v. King*, 77 Ill. 466; *Kelly v. Kendall*, 118 id. 650; Kerr on Fraud and Mistake, 358.

In order to defeat a claim for specific performance, the misconduct of complainant need not amount to such a degree or character of fraud as would be necessary to show in order to entitle the other party to have a contract once made, rescinded. *Race v. Weston*, 86 Ill. 94; Adams' Eq. *83, *84; Fry on Specific Per. *192.

Misconduct which would not constitute fraud sufficient to invalidate a contract, would yet defeat the perpetrator in any attempt to secure specific performance. Adams' Eq. *supra;* 3 Parsons on Contracts, (ed. of 1882,) *414, *415, and note.

A broker can not act for both parties without the full knowledge and assent of both. An agent for the seller can not, in any way, be interested in the sale of the property of his principal, except with full knowledge and consent of his principal. Such knowledge on the principal's part must include every matter known to the agent which might affect the interests or the action of the principal. *Tyler v. Sanborn*, 128 Ill. 136; *Porter v. Woodruff*, 36 N. J. Eq. 174; *Marsh v. Buchan*, 46 id. 595; *Rice v. Wood*, 113 Mass. 133; *Kronenberger v. Fricke*, 22 Ill. App. 550.

This is just as true when the price has been fixed beforehand by the principal, as where the agent has authority to negotiate for a price, and sell, generally. *Tyler v. Sanborn*,

128 Ill. 143; *Kerfoot* v. *Hyman*, 52 id. 514; *Ruckman* v. *Bergholtz*, 37 N. J. L. 437; *Iron Co.* v. *Harper*, 41 Ohio St. 100.

Even though the Trust company had announced to Mason its willingness to sell for the face value of the certificate, yet he was bound to obtain the highest price he could, and to notify the company of any facts coming to his knowledge as to an increase in the value of that property. *Hegenmyer* v. *Marks*, 37 Minn. 6; *Greenfield Bank* v. *Simons*, 133 Mass. 415; *Kerfoot* v. *Hyman*, 52 Ill. 514; *Woodsworth* v. *Adams*, 11 U. S. 303.

The mere possession by Mason of the blank assignment afforded no evidence of his power to fill the blank. *Chauncy* v. *Arnold*, 24 N. Y. 330.

If Mason was known to Chytraus simply as the attorney of the owner of the certificate, then he had no right to assume that Mason could transfer or sell the same. *White* v. *Hildreth*, 13 N. H. 108; *Childs* v. *Eureka Works*, 44 id. 354; *Russell* v. *Drummond*, 6 Ind. 216.

A master's certificate of purchase is not a negotiable instrument. *Bowman* v. *People*, 82 Ill. 248; *Frederick* v. *Ewrig*, id. 364; *Roberts* v. *Clelland*, id. 538.

Even negotiable instruments can not be assigned by a separate instrument, so as to pass the legal title. (*Ryan* v. *May*, 14 Ill. 49; *Badgley* v. *Votrain*, 68 id. 25.) And all equities will attach in the hands of such an assignee. *Haskell* v. *Brown*, 65 Ill. 29.

One who claims the protection of a court of equity as a *bona fide* purchaser must show that he acquired the legal title before notice, or knowledge of facts equivalent to notice. See 16 Am. and Eng. Ency. of Law, 839.

The purchaser of a mere equitable estate is not embraced within the definition of a *bona fide* purchaser. Ibid. 833.

Mason, whether regarded as a trustee or a mere agent to sell, is liable to his principal for the difference between the actual price received, and the price that, with reasonable

diligence in selling, and in the exercise of good faith toward his principal, he ought to have obtained for the certificate. *Greenfield Bank* v. *Simons*, 133 Mass. 415; *Hart* v. *Ten Eyck*, 2 Johns. Ch. 62; *Crawford* v. *Cockran*, 39 Iowa, 484; 2 Perry on Trusts, sec. 847.

Messrs. MASON BROS., *pro se.*

Messrs. BLANKE & CHYTRAUS, for the plaintiffs in error Carson, Chytraus, Haugan and Lindgren.

Mr. A. M. PENCE, and Messrs. GARTSIDE & LEFFINGWELL, for the defendant in error Smith:

A contract by letter is completed the instant the letter accepting the offer is mailed, and is valid and binding whether the letter is received or not. *Haas* v. *Myers*, 111 Ill. 421.

As to the consideration for the contract, see *Buchanan* v. *Bank,* 78 Ill. 505.

As to the right of Smith to redeem through judgment creditors, see *Phillips* v. *Demoss*, 14 Ill. 410; *Karnes* v. *Lloyd*, 52 id. 116; *Martin* v. *Judd*, 60 id. 81; *Moore* v. *Pickett*, 62 id. 158; *Pearson* v. *Pearson*, 131 id. 464; *Trotter* v. *Smith*, 59 id. 240.

This court has held in several cases that a contract extending the time of redemption of lands will be enforced, and a redemption allowed within the time designated by the contract. *Davis* v. *Dresback*, 81 Ill. 393; *Stephens* v. *Insurance Co.* 43 id. 327; *Pensoneau* v. *Pulliam*, 47 id. 58; *Ross* v. *Sutherland,* 81 id. 275; *Insurance Co.* v. *White*, 106 id. 67; *Schoonhoven* v. *Pratt*, 25 id. 457.

A certificate of purchase prior to the expiration of fifteen months is not realty, but only personal property.

A purchaser at execution sale does not have an interest in real estate until the expiration of fifteen months. Until then it is only a chose in action, and hence a contract to redeem is not obnoxious to the Statute of Frauds. *Bowman* v. *People,*

82 Ill. 246; *Roberts* v. *Clelland,* id. 538; *Hart* v. *Wingart,* 83 id. 282; *Phillips* v. *Demoss,* 14 id. 410; *Harden* v. *Eames,* 5 Ill. App. 153; *Fifield* v. *Gorton,* 15 id. 458.

A transfer of a certificate of sale to the owner of the equity operates as a redemption. *Frederick* v. *Ewrig,* 82 Ill. 363.

The certificate not being negotiable, was subject to every equity, the same as if in the hands of the trust company. *Roberts* v. *Clelland,* 82 Ill. 538; Rev. Stat. title "Judgments," sec. 29.

The principle invoked by plaintiffs in error does not apply, viz., "when equities are equal the legal title will prevail," as they have no legal title. The legal title to a negotiable instrument will not pass by an assignment on a separate piece of paper. *Barrett* v. *Hinckley,* 124 Ill. 32; *Badgley* v. *Votrain,* 68 id. 25; *Schultze* v. *Houfes,* 96 id. 340.

Moreover, Chytraus had notice of Smith's rights to any surplus which might arise upon a redemption and sale which might be made by any judgment creditor. *Hart* v. *Wingart,* 83 Ill. 282.

Whether this be treated as a contract complete in all its parts, or whether the negotiations be treated simply as declarations or representations, on which Smith acted, the same results will be attained, for in the latter case the acts and conduct of the Equitable Trust Company and its agents, being so acted upon, will constitute an estoppel, and the company will not be permitted to allege that it is not bound by any contract. Such acts and conduct, so acted upon, will be treated as an equitable estoppel. *Insurance Co.* v. *White,* 106 Ill. 67; *Reigard* v. *McNeil,* 38 id. 400; *Schoonhoven* v. *Pratt,* 25 id. 457; *Pensoneau* v. *Pulliam,* 47 id. 58; *Stephens* v. *Insurance Co.* 43 id. 327; *Davis* v. *Dresback,* 81 id. 393; *Gage* v. *Scales,* 100 id. 218; *Haworth* v. *Taylor,* 106 id. 275; *Hennehan* v. *Friedman,* 13 Ill. App. 226.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

In the view that we take of this case it will be most convenient, in considering the several questions discussed in the arguments before us, to determine, first, whether there was a binding contract between the Equitable Trust Company and Edward G. Smith, whereby the former sold to the latter, for a named consideration to be paid by the latter, the certificate of sale which is the subject of the present litigation.

Without going into unnecessary details, it is sufficient to say that Smith had executed several mortgages to the Equitable Trust Company on distinct lots in the city of Chicago, designated by certain numbers, to secure different sums of indebtedness due from him to that company; that these mortgages had been foreclosed,—that for the greater amount of indebtedness on lot 1, and perhaps also that for one of the lesser amounts of indebtedness on one of the other lots, in the Circuit Court of the United States for the Northern District of Illinois, and the other in the circuit court of Cook county; that there were sales of the lots under these decrees of foreclosure, and the property was purchased by the Equitable Trust Company, to whom certificates of purchase were issued, the fifteen months time allowed for redemption, in the case of lot 1 expiring on the 25th day of September, 1890, and that in the case of the other lots expiring at an earlier date; that the principal office of the Equitable Trust Company was in New York City, where were its president and secretary, who alone had power to make absolute sales of its property, but it had a general agent for transacting its business in the west,— George W. Kendall,—whose office was in Chicago, who had power to negotiate sales of its property, etc., subject to the approval of the president or secretary of the company; that Smith believed that the property was worth much more than the amounts for which it was sold, and desired to redeem it, and frequently made known his desire, in that respect, to

George W. Kendall; that Kendall, while protesting that he had no authority to sell the certificates of sale without the express sanction of the company, nevertheless assured Smith, from time to time, — first, before the expiration of twelve months from the day of sale, and again several times afterwards,—that he might purchase the certificates of purchase by paying the company the amount necessary to redeem from the sales, at any time before the expiration of fifteen months from the dates of the sales, and Smith testified, and he is not therein contradicted, that in February or March, 1890, he called at the office of the Equitable Trust Company in New York City, and told those in charge of the office that he was going to try to redeem the property, and they replied to him that when he got to the point that he had the money, to see Mr. Kendall.

The certificate here in controversy is on what is designated as lot 1. The Equitable Trust Company also held three other certificates of sales for the other lots, designated 4 and 5, which were for comparatively small sums. On the 6th of September, 1890, Smith informed Kendall that he had made arrangements to have those certificates redeemed, and that he would be ready the next week to redeem the certificate for lot 1, and requested Kendall to have the certificates sent to Mason Bros., the attorneys for the Equitable Trust Company, who had conducted the foreclosure proceedings, for that purpose. Kendall telegraphed the Equitable Trust Company to that effect, and on the same day wrote them the following letter, the words "Smith-Kerfoot" meaning the property mortgaged by Smith:

(Smith Kerfoot.)               "CHICAGO, *September 6, 1890.*

*"Equitable Trust Co., N. Y. City, N. Y.:*

"DEAR SIR—I telegraphed you to-day to for'd to Mason Bros. the three Smith certificates in south quarter 4 and on lot 5, (Smith-Kerfoot,) assigned in blank. Newman was in and said they were ready to take them up. Newman holds the equity,

but wants assignment so as to take out deeds under these certificates, so as to cut off Smith's subsequent judgments. Say they will be ready next week to take up block 1.

       "Yours, truly.           G. W. Kendall."

Pursuant to this request, the company forwarded to Mason Bros. the three certificates, and accompanied them with the following letter:

                         "*September 8, 1890.*

"*Messrs. Mason Bros., Chicago, Ill.:*

"Gents—We enclose three of the E. G. Smith master's certificates, with blank assignments of the same, and at the request of Mr. Kendall, who says the parties owning the equity were ready to buy them from us. If so, we are willing to sell them at par, and interest. Please close up the matter, if possible, and let us have the money. We would also like to sell the other certificate on block 1, and understand that they will wish to buy it some time this week. As soon as they are ready please inform us, and we will execute an assignment and forward the certificate.

       "Yours, truly.        W. Emlen Roosevelt, *Sec.*"

And on the same day the company also wrote to Kendall, as follows:

                 "New York, *September 8, 1890.*

   (*In re* E. G. Smith, etc.)

"*G. W. Kendall, Esq., Chicago, Ill.:*

"Dear Sir—We have to-day forwarded, as you requested, three master's certificates of the E. G. Smith property. We suppose it was as well to do this, although we confess we should have liked to have had the other certificate go at the same time, and were a little inclined to hold these until they took the other, but suppose you have looked into that matter carefully.  *   *   *

       "Yours, truly.        W. Emlen Roosevelt, *Sec.*"

Kendall testified: "Mr. Newman was introduced to me by Mr. Smith * * * in relation to buying the three certificates. * * * With reference to the three certificates,

I told Mr. Mason to deliver them to any person that either Mr. Newman or Mr. Smith designated." Newman testified: "Whatever I did was in the interest of Smith."

The money was paid to Mason Bros. by Newman for the three small certificates on the 18th of September, 1890, and on that day Mason Bros. telegraphed the Equitable Trust Company, as follows:

"CHICAGO, ILL., *9/ 18/ 90.*
*"Messrs. Roosevelt & Son, 23 Wall st., New York:*

"We sell to-day at par, and accrued interest, the three Smith foreclosure certificates sent us September 8. Parties are now ready to buy certificate on block 1. Kindly mail it to us at once, and wire to that effect. MASON BROS."

The testimony of Smith and Kendall is to the effect that on the evening of the 16th of September, 1890, Smith informed Kendall that he had arranged for all the money with which to pay for the certificate on block 1, and that Kendall thereupon wrote the following letter to the Equitable Trust Company, omitting the caption:

"*Dear Sirs*—Send the certificate block 1, Smith-Kerfoot, to Mason Bros., assigned in blank, with instructions to deliver to party designated by me, on payment of amount due.

"Yours, truly. G. W. KENDALL."

To this the company made the following reply:

"NEW YORK, *September 18, 1890.*
*"G. W. Kendall, Esq., Chicago, Ill.:*

"DEAR SIR—We are this morning in receipt of your favor of 16th inst., requesting us to send assignment of certificate to block 1 to Mason Bros., and we have done so to-day. Hope you will get the matter settled up soon, because we do not think it would be well to hold the certificate long after we can take out a deed. We hope you will have the matter settled before the 25th inst., which is the day on which the deed is due. We have also a letter * * *

"Yours, truly. W. EMLEN ROOSEVELT & SON."

And on the same day the company sent the following letter :

"*September 18, 1890.*

"*Messrs. Mason Bros., Chicago, Ill.:*

"Gents—We enclose you herewith master's certificate on block 1, Smith-Kerfoot matter, with an assignment in blank, without recourse, which you may deliver to the parties designated by Mr. Kendall, upon receipt of amount due, which please remit to us.

"Yours, truly.       W. Emlen Roosevelt, *Sec.*"

On the 20th of September, 1890, Smith sent a telegram to the Equitable Trust Company, as follows, but, by mistake of the telegraph company, Smith's name thereto was written "Howard" instead of "Edward:"

"*Equitable Trust Co., New York:*

"Three small foreclosures are paid. Cash absolutely ready block 1. Kendall in Indiana. Have you forwarded certificate assigned in blank, as per Kendall letter 16th inst.? Wire answer, and oblige.       Howard G. Smith."

On the same day the company replied by telegraph, as follows :

"*Howard G. Smith, Chicago, Ill.:*

"Blank assignment, block 1, sent Mason on 18th.

Roosevelt."

But in consequence of the direction being to "Howard" instead of "Edward" G. Smith it was not received. On the 19th of September, 1890, Kendall being absent from Chicago, at Walnut, Indiana, Smith mailed the following letter to him :

"*September 19, 1890.*

"*To Geo. W. Kendall, Walnut, Marshall County, Ind.:*

"Small foreclosures are paid. Cash absolutely ready for block 1. Mason refused abstract to Handy. He acts queer, generally. Can I get assignment, or must I prepare for formal redemption? When will you be here? Answer promptly, and oblige.       Edward G. Smith."

This was received by Kendall about half-past eleven on the following day,—September 20, 1890,—and on the same day Kendall mailed the following reply to this letter:

·"*E. G. Smith, Adams Ex. Building, Chicago:*

"Will be in Chicago Tuesday morning. Get ready to take certificate and you shall have it.          G. W. KENDALL."

We are clearly of the opinion that these several communications constituted a valid legal contract between the Equitable Insurance Company and Edward G. Smith. The request of Kendall to send the certificate to block 1, assigned in blank, to Mason Bros., with instructions to deliver it to the party designated by Kendall, on payment of the amount due, and the compliance on the part of the company with that request, necessarily invested Kendall with full power to sell and transfer the certificate to whom he pleased, for the amount due upon the certificate. The Mason Bros. were to have no discretion in the matter. The right to designate the party to whom the certificate is to be delivered, subject only to the restriction that the delivery shall be upon payment of the amount due upon the certificate, necessarily implies the right to make the negotiations, without which no designation of the person could be made, and when that designation was once made it vested a right in the person designated, and the company could not thereafter withdraw the power under which Kendall had acted, or do any other act to impair that vested right.

It is contended, in argument, that the power vested in Kendall could not be exercised without the concurrence of the Mason Bros. This is very clearly a misapprehension of the meaning of Kendall's request, and of the grant of that request by the company. The power of designation sought by him and granted by the company is to be exercised by him, alone. What the Mason Bros. are to do involves neither judgment nor discretion, and is purely mechanical. It relates,

not to the *making* of a contract, but purely to the *performance* of a contract previously made, and, as between the parties to the contract, it adds nothing to the legal rights of the one nor detracts anything from the legal rights of the other. If the delivery ought to be made, the trust company could not be heard, in a court of equity, to say that it was not made, for equity will treat that as done which ought to be done.

The undertakings of the parties are mutual and concurrent. In consideration that Smith undertakes to pay the trust company the amount which would be necessary to redeem from the sale, the trust company undertakes to transfer to him the certificate of sale,—in other words, to allow him to redeem from the sale notwithstanding the period within which he could legally redeem has passed. The extension of the period of redemption beyond that fixed by law may as well form the subject of a contract as any other property right. The interest of the purchaser in the certificate is property, and he may, in the absence of fraud, dispose of it as he pleases, and the former owner of the equity may therefore purchase a right of redemption previously lost, as well as any other right or title to the property. The fact that the amount agreed to be paid is precisely the same that would have been paid had a legal redemption been made by a judgment creditor, affects merely the amount of the consideration, and not the fact of consideration, for any agreement to give a right where none before existed, or to extend or enlarge a previously existing right, in consideration of any sum to be paid therefor, is by all the authorities, in the absence of fraud, ample consideration to support a contract.

On the 20th of September, 1890, Kendall was empowered to make a contract for the sale of the certificate for the amount of redemption. At that time the company had made no effort to withdraw this power nor to make any contract superseding its exercise. Smith's offer was before him. Kendall accepted it by saying, "Get ready to take the certificate

.and you shall have it," as effectually as if A were to say to B, "I will give you $100 for your horse," and B were to reply, "Get ready to take him and you shall have him." What more could be said to bring the minds of the parties together? We can conceive of nothing. The mailing of Kendall's reply closed the contract then, and it is immaterial that the reply was not received by Smith until two or three days later. *Haas* v. *Myers,* 111 Ill. 421.

But it is assumed Smith could not have then been sued upon the contract had he refused to perform it, and it is argued that since it was not binding upon Smith it was not binding upon the trust company. But this assumption is wholly unwarranted. Although, until acceptance, Smith's proposal in his declarations and letters was a mere offer, the moment that offer was accepted he became bound to carry it out, and he would have been held liable in an action at law for a refusal. Chitty on Contracts, (11th Am. ed.) p. 17, and notes, p. 12, and notes; Bishop on Contracts, (1st ed.) sec. 177, *et seq.*

But it is further insisted, in argument, that conceding there was a contract, the evidence fails to show that Smith was able and ready to perform it. We have carefully considered the evidence on this point, and without deeming it necessary to recite it and comment upon it at large, we think it proves that Smith was able and ready to perform his part of the contract. It is true that to enable himself to do so he had to make contracts with other parties, selling or mortgaging to them the rights he was to derive under this contract, but that concerned no one but him and those parties. It could not possibly concern the trust company what uses he should make of the property, nor what profits he or others should make out of it, by contracts of sale or otherwise, so long as that company should get what it was entitled to have under its contract.

17—141 ILL.

Again, it is contended that Smith practiced a fraud upon the trust company by persuading Kendall to withhold from the company knowledge which he would otherwise have communicated to it, of the value of the property. We think it very clear, from the evidence, that the value of the property in no degree affected the company in making this contract. While it is true that Smith had no legal right to redeem after the expiration of twelve months from the day of sale, it is equally true that the trust company could have no title in the property until it should receive a deed for it, which could not be sooner than fifteen months from the day of sale. After the expiration of twelve months, and before the expiration of fifteen months, the property was liable to be redeemed by Smith's creditors, of whom he had many, and the greater the value of the property the more certainly it would be redeemed by some of those creditors. It could make no possible difference to the trust company whether the redemption within that period should be made by one person rather than by another, since the effect of any redemption would be to terminate the rights of the company by the payment of the same sum of money; and hence, in contracting to give Smith a right that might otherwise be enjoyed by one of his creditors to his exclusion, for the amount necessary to redeem from the sale, the company would get all it could get from the creditor, whatever might be the actual value of the property. Although Smith had no legal right, himself, to redeem through one of his creditors, he had the clear and undoubted right to do all he could to cause his creditors to redeem, for thereby he would cause the property to pay that much more of his indebtedness, and whatever rights he might acquire, by contract, from his creditors, after or in view of a valid redemption, could by no possibility concern any one but the parties contracting. The evidence proves that the company believed that the property would be redeemed within the fifteen months, and that it was willing that Smith should have the benefit of the redemption—

indeed, that it preferred that he should have it. There is no pretense that there was any concealment in this respect. As early as February or March, 1890, Smith informed the officers of the company that he expected to redeem, and instead of discouraging him they told him that when he got to the point that he had the money, to see Mr. Kendall,—thus making Kendall their agent for negotiations in that respect. Kendall knew that Smith expected to redeem the property, and knew how he expected to get the money, for Smith kept him fully informed in that respect, and Kendall encouraged him in his efforts. Kendall informed the company that the property would be redeemed, and there is not the slightest pretense that he acted in bad faith in that respect, or that Smith acted in bad faith in assuring him that the property would be redeemed; and we think it quite clear from the evidence, as a matter of fact, though not indispensable to a decision of the question before us, that had the company refused to sell the certificate to Smith, the property would have been redeemed by one of his creditors. We can not presume that had the company known that the property was of far greater value than it was supposed by its officers to be, it would have been less willing that Smith should purchase the certificate rather than that his creditors should redeem from the sale.

The next question to be considered is, what right did Chytraus acquire in the property by virtue of his contract with Mason Bros., and their delivery to him of the certificate of sale, accompanied by a separate paper purporting to be an assignment of it in blank. Mason Bros. were simply the solicitors of the trust company in the foreclosure proceedings, and had no general authority to negotiate sale of the certificates of purchase. The only authority which it is claimed they had from the trust company to negotiate sale of the certificates in controversy was this: Mason Bros. sent the following letter to the trust company:

"CHICAGO, ILL., *September 20, 1890.*
"*To Roosevelt & Son, 33 Wall st., N. Y.:*

"Letter and foreclosure certificate received.   Our last directions from Kendall were, to sell to the first party who would pay cash.   Shall we still do so?   Kendall is out of town, and we don't know his present address or time of return.

MASON BROS."

To this the following reply was made, by telegram, on the date therein given:

"*Mason Bros., Chicago, Ill.:*          "*September 22, 1890.*

"Sell certificate to first man who will pay for it in full.

W. EMLEN ROOSEVELT, *Sec.*

It will be remembered that the contract between Smith and the company was closed on the 20th of September, 1890, and it can need no argument to demonstrate that the company could not, two days thereafter, invest Mason Bros., or any one else, with authority to make any contract inconsistent with the contract with Smith.

The certificate of purchase was not assigned to Chytraus. It was simply accompanied by a blank assignment of the trust company.   This did not even vest the legal title to the certificate in Chytraus, for the statute only gives the "person to whom the same shall be so assigned"—*i. e.,* by indorsement on the certificate—"the same benefits therefrom" as the assignor would otherwise have had, (Rev. Stat. 1874, chap. 77, title "Judgments," sec. 29,) and in no view could it have done more than put Chytraus in the place of the trust company as respects rights by virtue of the certificate, and so whatever equitable defenses could have been interposed against it, could have been interposed against him.   *Roberts* v. *Clelland,* 82 Ill. 538 ; *Olds* v. *Cummings,* 31 id. 188.

Whatever equity Chytraus acquired in the property by virtue of his contract with Mason Bros. was subsequent, in point of time, to that acquired in the property by Smith by virtue

of his contract with the trust company, and therefore Smith's equity, being the oldest, must prevail. (*Schultze* v. *Houfes*, 96 Ill. 340.) The purchaser of a mere equitable estate is not embraced within the definition of a *bona fide* purchaser. 16 Am. and Eng. Ency. of Law, 833, and cases cited.

Upon a full and careful consideration of the case, in every view of which it is susceptible, we are unable to discover such error in the decree below as requires that we should reverse it. It is therefore affirmed. *Decree affirmed.*