Paramount Pictures Distributing Corporation, Appellant, v. Jean T. Gehring and George Gehring, Appellees.

Gen. No. 38,117.

Opinion filed February 11, 1936.

Spitz & Adcock, of Chicago, for appellant; Eli E. Fink, of Chicago, of counsel.

M. A. Reinstein, of Chicago, for appellee; Sol. R. Malkin, of Chicago, of counsel.

Mr. Justice John J. Sullivan delivered the opinion of the court.

February 8, 1934, plaintiff, Paramount Pictures Distributing Corporation, which is engaged in the business of leasing motion picture films to exhibitors or operators of motion picture theatres, brought an action against Jean T. Gehring and George Gehring, alleged owners and operators of the Rosewood Theatre in Chicago, for damages resulting from defendants' alleged breach of three motion picture film contracts. Upon the jury's verdict, finding the issues against plaintiff, the trial court entered judgment. Plaintiff

charged in the second count of its statement of claim and it sought to prove that the defendants were partners in the business of operating the Rosewood Theatre, but now states that, inasmuch as the evidence on the issue of their partnership was conflicting, it has concluded not to question the judgment of the trial court in favor of the defendant George Gehring and prosecutes this appeal solely from the judgment rendered in favor of Jean T. Gehring (hereinafter referred to as the defendant) on the cause of action against her alone as set forth in the first count of its statement of claim.

The undisputed evidence shows that on December 6, 1933, Jean T. Gehring signed three applications, which constituted offers to enter into three different and separate motion picture contracts with plaintiff for the 1934 season. Each application contained the following provision:

"*Acceptance of Application*—Seventeenth: This instrument shall be deemed an application for a license under copyright only and shall not become binding until accepted in writing without alteration or change by an officer of or any person duly authorized by the Distributor and notice of acceptance sent to the Exhibitor as herein provided. . . . Unless notice of acceptance of this application by the Distributor is sent to the Exhibitor by mail or telegraph within fifteen (15) days after the date thereof, . . . said application shall be deemed to have been withdrawn."

One application was for 53 feature length pictures at a total rental of $2,405, the second called for 96 short length pictures at a total rental of $408 and the third was for 52 news reel pictures at a total rental of $260, amounting in the aggregate to a rental of $3,073.

December 20, 1933, at 2:38 p. m., plaintiff delivered to the Western Union Telegraph Company the following telegram accepting defendant's three applications:

"December 20, 1933.

"Mrs. J. Gehring,
Rosewood Theatre,
1823 Montrose Avenue,
Chicago, Illinois.

"Contracts dated December sixth nineteen thirty three covering Paramount Feature News and Shorts for the year nineteen thirty three thirty four but excepting Marx Brothers production which must be passed upon separately by their representative are hereby approved.

"E. J. Barnard,
Paramount Picture Distributing Corp."

On the same day, George Gehring, husband of the defendant, Jean T. Gehring, entered an office of the Western Union Telegraph Company about 2:30 p. m., and sometime between then and 2:48 p. m. delivered to said Western Union Telegraph Company the following telegram seeking to revoke defendant's three applications:

"Paramount Pictures Corporation,
1306 South Michigan Avenue,
Chicago, Illinois.

"The time of the day is now 2:45 P. M. 12/20/33. As we have not received our approval on our application for contract dated December 6, 1933, herewith please accept our cancellation for contract of same.

"J. T. Gehring,
Rosewood Theatre."

Although the record is silent as to the exact tim~ the addressees received the respective telegrams, appears that they were both received later the sar

afternoon and that plaintiff received defendant's telegram of revocation sometime after its telegram of acceptance of the offers contained in defendant's three applications was delivered to the telegraph company. Within five days thereafter plaintiff tendered performance, insisting that valid contracts had been entered into and demanding performance by the defendant, who declared that no contracts had been made and definitely disclaimed and repudiated all responsibility, claiming that she had revoked her offers for the rental of plaintiff's films before they were accepted.

The only disputed question of fact in the case was as to the time defendant's telegram of revocation was delivered to the telegraph company. George Gehring testified that he entered the office of the telegraph company at exactly 2:30 p. m. on December 20, 1933, with the body of the telegram written on a piece of paper, but unsigned and without the name and address of any addressee. It appears that some conversation ensued between him and the young lady employee of the Western Union Company and that before she filed the message for sending she pasted the paper containing the message on a company message form, the message was signed, the addressee's name and address were inserted by her, the figures "2:30" p. m., in the original draft of the message presented to her by Gehring were changed to "2:45" p. m., either at Gehring's direction or with his consent, and that the message was finally filed for sending at 2:48 p. m. Miss Russell, the telegraph company's employee, made the following written report of the occurrence to the superintendent of her employer on January 5, 1934:

"Mr. Gehring brought message in shortly after 2:30 as he had it written on piece of paper with no name to address or signature. He gave me the message and then said 'Let me see that again' and stood and talked

with me awhile. He then paid me for the message and looked at the clock and then said, 'You'd better make that time on there 2:45 instead of 2:30 P.' This I did. I immediately timed the message (it was 2:48 then) and sent it at 2:50 P.''

Defendant argues that the evidence showed that her telegram of revocation was delivered to the telegraph company before plaintiff's telegram of acceptance. While it is immaterial, as will hereafter be shown, which telegram was delivered to the telegraph company first, we have set forth the above evidence to show that even on this question the evidence is conclusive that plaintiff's telegram of acceptance was delivered to the telegraph company before defendant's telegram of revocation.

Plaintiff contends that legal and binding contracts were entered into between it and defendant when its wire of acceptance was delivered to the telegraph company at 2:38 p. m., December 20, 1933, and that, regardless of the time that defendant's telegram of revocation was delivered to the telegraph company, it is clearly the law that an offerer's wire of revocation is not effective until received by the offeree.

Defendant's theory is that no contracts were entered into by the parties inasmuch as the offers contained in her application were revoked before accepted by plaintiff; that plaintiff's acceptance was qualified and therefore required further approval by defendant; that the stipulation in the applications as to the damages for the breach of the contracts provided for a penalty and not liquidated damages; and that the burden was upon plaintiff to show that it suffered actual damages, which it failed to do.

There is no more well established rule in the law of contracts than that an acceptance sent by an authorized mode of communication takes effect and the con-

tract is made when the message of acceptance is deposited by the offeree for delivery to the offerer.

The contract is complete on delivery of the message of acceptance to the telegraph company. (Clark on Contracts, p. 34.) A contract by telegram may be completed by delivering a telegraphic despatch of acceptance for transmission at the receiving office of the telegraph company. (Williston on Contracts, p. 144, sec. 82.) The contract is concluded when an acceptance of a proposition is deposited in the telegraph office for transmission. (Note in 47 A. L. R. 159.) Where a person makes an offer and requires or authorizes the offeree, either expressly or impliedly, to send an answer by post or telegram and the answer is duly posted or telegraphed, the acceptance is communicated and the contract is complete from the moment the letter is mailed or the telegram sent. (13 C. J. 300.) A contract becomes complete at the time the acceptance is delivered to the telegraph company without regard to the time the telegram is actually received. (Elliott on Contracts, p. 55; *Fox v. Turner,* 1 Ill. App. 153; *Cobb v. Foree,* 38 Ill. App. 255; *Bay State Milling Co. v. Barth,* 135 Ill. App. 539; *Ziehme v. McInerney,* 167 Ill. App. 577; *Sinaiko v. Illinois Smelting & Refining Co.,* 215 Ill. App. 108; *Chytraus v. Smith,* 141 Ill. 231; *Wagner v. McClay,* 306 Ill. 560.)

In discussing this question and the reason for the rule in *Hallock v. Commercial Ins. Co.,* 26 N. J. L. 268, the court said, at p. 282:

"There is in fact no difference between the acceptance of a proposition by word of mouth and a letter stating an acceptance. In the one case it is articulate sounds carried in the air, in the other, written signs carried by the mail or by telegraph. The vital question is, was the intention manifested by an overt act, not by what kind of messenger it was sent. The

bargain, if ever struck at all, must be *eo instanti* with such overt act. Mailing a letter containing an acceptance, or the instrument itself intended for the other party, is certainly such an act."

In *Cottingham v. National Mut. Church Ins. Co.*, 290 Ill. 26, our Supreme Court said, at p. 32:

"A contract is complete when an unqualified assent to the offer of one of the parties is dropped in the post-office properly directed and stamped by the other party, unless the offer is so qualified as to require the actual receipt of the letter of acceptance before the agreement is complete."

While it is urged in the instant case that the acceptance was qualified in that it excepted "Marx Brothers production" from the scope of the offers accepted, defendant's argument in this regard is without force since her application covering the matter specified that the "Marx Brothers" and certain other films were to be treated and considered independently. The acceptance of the offers contained in the three applications was, in our opinion, absolutely unqualified and the reference in plaintiff's telegram to the "Marx Brothers production" had nothing whatever to do with its acceptance of defendant's applications for the films which are the subject of the contracts in question.

Defendant insists that under the law she was entitled to personal notice of the acceptance of her offers. The law is, however, to the contrary. She, of course, had the right, if she had so desired, to specify in her offers that their acceptance would not be binding upon her until the actual receipt by her of notice of same. This she did not do. In the absence of such a condition or specification the law as hereinbefore stated applies. But defendant not only did not attach to her offer any condition requiring the actual receipt of the acceptance by her before it would be effective to complete the contract, but in her application she expressly

authorized acceptance of same "by mail or telegraph within fifteen (15) days after the date thereof." Her offers were made December 6, 1933, and, not having been previously revoked, they were accepted by plaintiff within 15 days, on December 20, 1933.

Predicated upon her claim that the evidence showed that her telegram of revocation was delivered to the telegraph company prior to plaintiff's telegram of acceptance, defendant urges that the revocation of her offers was effective from the moment of its delivery to the telegraph company. It is almost universally settled that a revocation requires communication and that, therefore, an acceptance prior to a communicated revocation will make a binding contract. (Williston on Contracts, p. 56.) It is admitted that plaintiff had not received the telegram of revocation until after it had delivered its telegram of acceptance to the telegraph company. The authorities are abundant to the proposition that, when an offer is made and accepted by the posting of a letter of acceptance or by the delivery of a message of acceptance to a telegraph company before notice of the withdrawal of the offer is received, the contract is not impaired by the fact that the revocation had been mailed or telegraphed before the acceptance had been mailed or telegraphed. (*Patrick v. Bowman,* 149 U. S. 411.)

In *Wagner v. McClay, supra,* the defendants gave the plaintiffs an option to purchase certain coal and within the period of the option the plaintiffs mailed their acceptance. On the following day, but before they received the letter of acceptance, defendants visited plaintiffs and attempted to revoke the option. In this case, holding that the revocation is operative only from the time it is received, the court said, at pp. 563, 564:

"On the question of the sufficiency of the acceptance of the offer the authorities cited are to the effect that

when a letter of acceptance is deposited in the mail, properly addressed and stamped, it will be considered that the acceptance is binding, while the revocation of an option contract only operates from the time it is received by the one to whom it is sent and has no legal effect prior to that time. (1 Elliott on Contracts, secs. 44, 34, and note on p. 53.) According to the testimony of plaintiffs in error they wrote defendants in error that the money was in the bank ready for them on the $2400 basis, and the next day McClay and his son James came in and said they did not want to stand by the $2400 contract.

"It is argued that as plaintiffs in error resided at some distance from the defendants in error it must have been understood that the acceptance might be sent by mail. 'Where the circumstances are such that it must have been within the contemplation of the parties that according to the ordinary usages of mankind the post might be used as a means of communicating the acceptance,' acceptance by mail is implied and the contract is complete from the moment the letter is mailed. (13 Corpus Juris, sec. 116, p. 300.) We are of the opinion that the letter of acceptance was mailed before McClay revoked this offer."

On the undisputed facts in this case it was clearly the duty of the trial court to have allowed plaintiff's motion made at the close of all the evidence to direct a verdict in its favor since, under the law, a complete valid contract existed and defendant had refused to perform same. This brings us to the question of damages.

In so far as we have been able to learn, the question of the damages to be allowed in this character of case has not been heretofore presented to or determined by the Supreme or Appellate Courts of this State. We see no reason why the ordinary rules as to damages for the breach of contracts generally should not be

applicable to the breach of motion picture contracts. The general rule is stated in 17 C. J., pp. 847, 848, as follows:

"The measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed. In other words, the person injured is, so far as it is possible to do so by a monetary award, to be placed in the position he would have been in had the contract been performed."

It is a matter of common knowledge that the production costs of making moving pictures are enormous and that the producer's only method of reimbursing itself for such costs and realizing a profit, if possible, is by licensing the use of or renting the duplicate films of such pictures to exhibitors and operators of moving picture theatres. It is, of course, apparent that the cost of making each picture remains the same regardless of how many theatres rent the films for exhibition. Plaintiff introduced evidence to the effect that it makes about 300 duplicate prints of each picture and endeavors to rent them to practically every theatre in the country, actually renting them to about 85 per cent of the theatres in Chicago; that there were four other theatres in the neighborhood of defendant's theatre, all of which had theretofore entered into contracts with plaintiff for the rental of its pictures for the entire year of 1934; that there was no limit to the number of prints it always had available; and that it did not realize any rental from the films specified in the contracts which defendant refused to take and pay for.

If defendant had performed her contracts plaintiff would have been entitled to receive $3,073 as the total rent for its films, and we cannot perceive why her wrongful refusal to perform should absolve her from

paying any less. It is only by the payment of that amount that plaintiff will be placed in the position it would have been in had the contracts been performed. We think that the leasing of a motion picture film is somewhat analogous to the leasing of an apartment. In either case the leasing contract calls for a specified rental, and in the one the distributing company and in the other the landlord is put to practically the same expense whether the film, in the first case, or the apartment, in the second, is used or not. In the case of the apartment, the rule is well established that a landlord's damages consist of the rental stipulated in the lease and that he establishes his case to recover the lease rental in the event of the tenant's breach by merely introducing the lease into evidence. (*Resser v. Corwin*, 72 Ill. App. 625; *Hinde v. Madansky*, 161 Ill. App. 216.)

Another situation which seems to us to be analogous is that of employment contracts where it is uniformly held that an employee's damages for the breach of such a contract amount to the wages specified in his contract and that he establishes his prima facie case for the contract salary merely by alleging the nonpayment of the salary and introducing the employment contract into evidence. (*Fuller v. Little*, 61 Ill. 21; *School Dist. No. 4 v. Stilley*, 36 Ill. App. 133.)

Still another analogous situation arises in the case of advertising contracts where it has also been held that the prima facie measure of damages is the amount called for by the contract. (*Phelps v. LaSalle Hotel Co.*, 209 Ill. App. 430; *Ware Bros. Co. v. Cortland Cart & Carriage Co.*, 192 N. Y. 439.)

Only one case involving the leasing of motion picture films has been called to our attention. In that case, *Metro-Goldwyn-Mayer Distributing Corp. v. Cooke* (Tex. Civ. App.), 56 S. W. (2d) 489, where it

was held that the rental specified in the contract should be allowed as damages for its breach, the court said at pp. 489, 492:

"The appellant corporation, engaged in distributing copyrighted photoplays and films, sued the defendant Cooke to recover $1,507.50 and interest, alleging the breach of five different contracts entered into between the parties, which provided for the exhibition by Cooke in his theater at Wellington of motion pictures and films to be furnished him by the appellant. The contracts describe the several films included in each of them respectively by production number and title and state the rental value. . . .

"The case has been tried twice upon the same pleadings and to remand it for another trial would seem to be a useless and expensive proceeding, since it is clear that under the evidence introduced in both trials appellant was clearly entitled to a judgment for the full amount sued for and that the appellee has no valid defense to the action. . . ."

In our opinion plaintiff's damages are as certain as are the damages in the case of an apartment lease, advertising contract or employment contract and it fully established its right to recover the $3,073 specified in the contracts as the total rental value of the films by introducing the three contracts into evidence and proving defendant's breach of them.

It is conceded that under the law it was plaintiff's duty to mitigate its damages, if possible. While this is true, it is also the law that the burden was on defendant to prove that plaintiff could have mitigated the damages. No evidence was offered by defendant that plaintiff could have in any way mitigated the damages, but on the other hand plaintiff introduced evidence that showed that it could have done nothing further than it did do to mitigate the damages.

The applications of defendant all contained the following provision:

"Remedy for Breach: If the Exhibitor shall fail or refuse to perform this contract or any other exhibition contract with the Distributor, in respect of *one or more* of the photoplays licensed for exhibition hereunder and/or thereunder, or (2) if this agreement is terminated by the Distributor because of the Exhibitor's breach thereof in charging less than the minimum admission prices herein specified, the Distributor may, at its option, declare such failure or refusal or breach, a breach of the entire contract entitling the Distributor to recover from the Exhibitor as damages for such breach the license fees payable in respect of all photoplays not theretofore exhibited under this contract, and the Distributor shall be under no obligation thereafter to deliver or offer to deliver any photoplay or photoplays hereunder."

Defendant contends that the provision for damages in this section of her applications should be construed as a penalty.

It has already been shown that under the general principles of the law of damages, plaintiff has the right to recover the rentals specified in the three contracts. In addition to that the parties themselves, by the adoption of the above provision, agreed upon what damages plaintiff should be entitled to recover in the event of a breach of the contracts by defendant.

In discussing this subject in *United States v. Bethlehem Steel Co.*, 205 U. S. 105, the Supreme Court of the United States said, at p. 119:

"The courts became more tolerant of such provisions, and have now become strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained."

Contracts by which parties who are under no legal compulsion agree beforehand upon the amount of damages which shall be allowed for the breach thereof are as lawful as any other unless they are inhibited by some rule of law. (*Parker-Washington Co. v. Chicago,* 267 Ill. 136.) There is no principle more elementary and better recognized than that when a price is fixed between the parties to a contract for the purchase or rental of property or the performance of labor, it must be accepted as the rule for recovery. Both court and jury must be governed by it as to the contract of the parties and neither has any power to alter it. (*Springdale Cemetery Ass'n v. Smith,* 24 Ill. 480.) The present tendency of the authorities is to allow the parties to make their own contracts and carry out their intentions in this respect. Their intention, which has been clearly manifested, cannot be disregarded by the court when the result is not shown to have been unconscionable. In such a case the law should and will enforce the agreement of the parties. (*Farley v. Knight Light & Soda Fountain Co.,* 223 Ill. App. 317.)

It can hardly be said that the damage clause in the contracts involved here is unconscionable or inhibited by law when it provides the same measure of damages as the law would allow under the general principles of contract law as heretofore shown, and, in any event, the defendant had the burden of proving that the damage clauses in the contracts called for illegal penalties. Not a word of evidence was offered by her to show that illegal penalties were provided for. Courts will give effect to the contracts of parties with reference to liquidated damages in the absence of fraud or unconscionable oppression. (*Lu-Mi-Nus Signs, Inc. v. Jefferson Shoe Stores, Inc.,* 257 Ill. App. 150.) In *Weiss v. United States Fidelity & Guaranty Co.,* 300 Ill. 11, the court held, at pp. 16 and 17:

"Plaintiff is entitled to rely on the contract to show that damages at the rate stipulated will result from the

breach. The burden of proof in such case is on the defendant to show that the contract provided for a penalty and not for liquidated damages, where there is nothing upon the face of the contract that requires the court to make the legal finding that the provision is for a penalty. Such a contract is *prima facie* evidence that the parties have stipulated and agreed on the actual amount of damages that ought to be recovered for a breach, and in the absence of evidence to the contrary the damages will be held to be liquidated damages.''

Such other points as are urged by defendant were either not raised in the court below or have no material bearing on the controlling questions involved in this proceeding, and in the view we take of this case we deem it unnecessary to discuss them.

Inasmuch as the material facts are undisputed and the jury could have properly assessed plaintiff's damages only in accordance with the stipulated license fees or rentals and the damage clauses of the contracts, and, inasmuch as the trial court, for the reasons stated herein, should have directed a verdict in plaintiff's favor and instructed the jury to assess its damages at $3,073, it would serve no useful purpose to remand this cause. Therefore, the judgment of the municipal court is reversed and judgment will be entered here in favor of plaintiff and against defendant for $3,073. Plaintiff's claim for interest is not allowed.

*Reversed and judgment here in favor of plaintiff and against defendant, Jean T. Gehring, for $3,073.*

SCANLAN, P. J., and FRIEND, J., concur.